

Priority ✓
Send ——
Enter ——
Closed ——
JS-6 ✓
JS-2/JS-3 ——
Scan Only——

FILED
CLERK, U.S. DISTRICT COURT

APR 27 2006

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| COMITE DE JORNALEROS DE REDONDO BEACH, an unincorporated association; NATIONAL DAY LABORER ORGANIZING NETWORK, an unincorporated association, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF REDONDO BEACH, <br><br> Defendant. | No. CV 04-9396 CBM (PJWx) <br><br> ORDER RE: PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT; PERMANENT INJUNCTION |

    The matters before the Court are the parties' cross-motions for summary judgment.

**JURISDICTION**

The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

ENTERED
CLERK, U.S. DISTRICT COURT

APR 28 2006

CENTRAL DISTRICT OF CALIFORNIA
BY      NG              DEPUTY

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).

- 1 -

128

## FACTUAL AND PROCEDURAL BACKGROUND

This case involves a facial First Amendment challenge to Redondo Beach Municipal Code § 3-7.1601 (hereinafter "the Ordinance"), which provides, in full:

> (a)  It shall be unlawful for any person to stand on a street or highway and solicit, or attempt to solicit, employment, business, or contributions from an occupant of any motor vehicle.  For purposes of this section, 'street or highway' shall mean all of that area dedicated to public use for public street purposes and shall include, but not be limited to, roadways, parkways, medians, alleys, sidewalks, curbs, and public ways.

> (b)  It shall be unlawful for any person to stop, park or stand a motor vehicle on a street or highway from which any occupant attempts to hire or hires for employment another person or persons.

Redondo Beach Municipal Code § 3-7.1601(a)-(b).

The City of Redondo Beach (hereinafter "the City") enacted the Ordinance into law on May 7, 1987.  On February 16, 1989, it was amended to add subdivision (b).  Violators have been punished through the imposition of fines, probation or both.

In October 2004, the City and its affiliated police department began to enforce the Ordinance aggressively at the intersections of Artesia Boulevard and Felton Lane and Manhattan Beach Boulevard and Inglewood Avenue, where individuals seeking temporary employment (i.e., "day laborers") frequently congregate.  They dubbed this increased enforcement effort the "Day Labor Enforcement Project."  The police force staged undercover sting operations in which officers, dressed in plain clothes and riding in unmarked cars, stopped to offer employment to day laborers, then detained and arrested them.

Plaintiffs, Comite de Jornaleros de Redondo Beach ("Comite") and National Day Laborer Orgainzing Network ("NDLON"), are unincorporated organizations

- 2 -

1  that represent the interests of day laborers and/or facilitate solidarity among local

2  day laborer groups striving to advance the laborers' human, employment and civil

3  rights.  Specifically, Comite identifies itself as "an unincorporated association

4  comprised of day laborers who seek to defend their rights and address the

5  difficulties that they face in seeking lawful employment as day workers." NDLON

6  identifies itself as "a nationwide coalition of day laborers and the agencies that

7  work with day laborers."  Its aims include "working for the repeal or invalidation

8  of laws that restrict the right of day laborers to solicit lawful employment."

9      Plaintiffs filed this lawsuit on November 16, 2004, seeking declaratory and

10  injunctive relief.  On December 15, 2004, the Court issued a preliminary

11  injunction restraining Defendants from enforcing the Ordinance and/or from

12  enforcing or seeking to punish violations of probation imposed based on

13  convictions obtained pursuant thereto.  The Ninth Circuit affirmed the issuance of

14  the injunction in an unpublished memorandum disposition on May 11, 2005.

15      Both Plaintiffs and the City now move for summary judgment.  The City

16  contends it is entitled to judgment as a matter of law because Plaintiffs lack Article

17  III standing and/or because the Ordinance is a valid "time, place and manner"

18  restriction.  Plaintiffs maintain that they do have standing under the Constitution

19  (and incident to the Court's previous orders addressing the issue) and that the

20  Ordinance is facially unconstitutional, either as an improper content-based

21  restriction of speech in a traditional public forum or as an overbroad content-

22  neutral regulation.

23                              **STANDARD OF LAW**

24      Summary judgment is appropriate when "the pleadings, depositions,

25  answers to interrogatories, and admissions on file, together with the affidavits, if

26  any, show that there is no genuine issue as to any material fact and that the moving

27

- 3 -

1  party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  A party

2  seeking summary judgment bears the initial burden of informing the court of the

3  basis for its motion and of identifying those portions of the pleadings and

4  discovery responses which demonstrate the absence of a genuine issue of material

5  fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where the nonmoving

6  party will have the burden of proof at trial, the movant can prevail merely by

7  pointing out that there is an absence of evidence to support the nonmoving party's

8  case.  *See id.*  If the moving party meets its initial burden, the nonmoving party

9  must then set forth, by affidavit or as otherwise provided in Rule 56, "specific

10  facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e);

11  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

12      In judging evidence at the summary judgment stage, the Court does not

13  make credibility determinations or weigh conflicting evidence and draws all

14  inferences in the light most favorable to the nonmoving party.  *T.W. Elec. Svc.,*

15  *Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987).  The

16  evidence presented by the parties must be admissible.  Fed. R. Civ. P. 56(e).

17  Conclusory, speculative testimony in affidavits and moving papers is insufficient

18  to raise genuine issues of fact and defeat summary judgment.  *See Thornhill Pub.*

19  *Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

20                              **ANALYSIS**

21  **I.    Standing**

22      The City asserts that it is entitled to summary judgment because Plaintiffs

23  do not have individual or associational standing to bring their challenge.  This

24  Court has twice analyzed and ruled on the issue of Plaintiffs' standing to sue.

25  First, in its Findings of Fact and Conclusions of Law in support of its order issuing

26  the preliminary injunction, filed on December 15, 2004, the Court determined that

27

1   Plaintiff organizations have associational Article III and prudential standing to

2   pursue this action on behalf of their largely unidentified day laborer members.

3   Second, in its Order Granting Plaintiffs' Motion for Reconsideration of Magistrate

4   Judge's Order Granting in Part and Denying in Part Plaintiffs' Motion for a

5   Protective Order, filed on October 4, 2005, the Court ruled that Plaintiffs have

6   standing to challenge the Ordinance *regardless* of their members' immigration

7   status or lack of authorization to work in the United States.

8        The City offers no cogent reason for the Court to depart from its earlier

9   rulings.  Although it contends, as it has in the past, that Plaintiff Comite does not

10  actually exist, the previously filed Declaration of Chris Newman (attached as

11  Exhibit 2 to the Perez Declaration accompanying Plaintiffs' present motion)

12  refutes that contention.  Newman, the Legal Programs Coordinator of co-Plaintiff

13  NDLON, states that he meets with the Comite three to five times each week.

14  Newman Decl. ¶ 2.  His declaration also refutes the City's contention that NDLON

15  has no day laborers as members. *Id.* at ¶ 4.  In addition, Plaintiffs point out that

16  Braulio Adalberto Gonzales testified at his deposition, taken on July 7, 2005, that

17  he is both a day laborer seeking work and a member of Comite, and that,

18  commencing in or around November 2004, the organization has held meetings and

19  participated in various events and gatherings. Exhibit GGGG.[1]

20       The City responds by insisting that Plaintiffs have offered no evidence that

21  Gonzalez and others have a legal right to work in the United States.  Thus, the City

22  argues, their solicitation of employment is tantamount to solicitation of the

23

24  ───────────────

25       [1]   The City argues that Mr. Gonzalez's statement that he is a member of Comite
      "does not prove its existence."  However, in making this argument, the City is essentially
26  attacking Mr. Gonzalez's credibility, which the Court cannot properly consider in the context of a
      motion for summary judgment.

27                                        - 5 -

1  commission of a crime, for which there is no First Amendment protection.

2  However, as discussed above, the Court visited this precise issue in a recent order

3  and explained that "although it is illegal to hire a person not authorized to work in

4  the United States . . . there does not appear to be any law that bars undocumented

5  persons from seeking work.  Therefore, Plaintiffs' members' speech is not illegal."

6  *See* Order Granting Plaintiffs' Motion for Reconsideration of Magistrate Judge's

7  Order Granting in Part and Denying in Part Plaintiffs' Motion for a Protective

8  Order, October 4, 2005, at 7.  In addition, the Court noted that, apart from the

9  suppression of their First Amendment rights, Plaintiffs have alleged other injuries

10 suffered by their members, including arrests, fines and prosecution, incident to the

11 City's enforcement of the Ordinance and that "these types of independent harms

12 can constitute an "injury-in-fact" under the First Amendment."  *Id.* at 8 (citing

13 *Virginia v. American Booksellers Ass'n*, 484 U.S. 383, 392, 108 S. Ct. 636, 98 L.

14 Ed. 2d 782 (1988); *Bigelow v. Virginia*, 421 U.S. 809, 817, 95 S. Ct. 2222, 44 L.

15 Ed. 2d 600 (1975)); *c.f. Jones v. City of Los Angeles*, __ F.3d __, 2006 U.S. App.

16 LEXIS 9306 at * 34 (9th Cir. Apr. 14, 2006) ("It is undisputed, however, that

17 Appellants have been and in the future will probably be fined, arrested,

18 imprisoned, and/or prosecuted, as well as suffer the loss of their personal property,

19 for involuntarily violating section 41.48(d).  These preconviction harms . . . suffice

20 to establish standing. . . .").  Thus, the Court concluded, the immigration status of

21 their individual members is irrelevant to Plaintiffs' standing to challenge the

22 Ordinance. *Id.* at 10.

23          Finally, even assuming arguendo that Plaintiffs' members' speech was

24 exempt from First Amendment protection, the Court recognized that Plaintiffs'

25 retain standing under the overbreadth doctrine, which "functions as an exception

26 to the general prohibition on a litigant's raising another person's legal rights."

27

- 6 -

1   *Dream Palace v. County of Maricopa*, 384 F.3d 990 (9th Cir. 2004) (internal

2   quotations omitted); *see also Young v. City of Simi Valley*, 216 F.3d 807, 815 (9th

3   Cir. 2000) (overbreadth doctrine "allows those who have suffered some

4   cognizable injury, but whose conduct may not be protected under the First

5   Amendment, to assert the constitutional rights of others."). The City has presented

6   no evidence to persuade the Court that application of the overbreadth doctrine is

7   unjustified in this instance; at the same time, the sweeping language of the

8   Ordinance itself (penalizing all "persons" who "stand on a street or highway" and

9   engage in solicitation speech directed at motor vehicles), together with the

10  asserted harms it was purportedly enacted to redress (*see* Section II.B.1, *infra*),

11  allows for a reasonable inference that others, who are not presently before the

12  Court, will be subject to prosecution under its provisions and thereby chilled from

13  engaging in speech in the first instance. *Accord Young*, 216 F.3d at 815 ("The

14  overbreadth doctrine is based on the observation that 'the very existence of some

15  broadly written laws has the potential to chill the expressive activity of others not

16  before the court.'") (quoting *Forsyth County v. Nationalist Movement*, 505 U.S.

17  123, 129, 120 L. Ed. 2d 101, 112 S. Ct. 2395 (1992)); *see also Gooding v. Wilson*,

18  405 U.S. 518, 521, 92 S. Ct. 1103; 31 L. Ed. 2d 408 (1972) (overbreadth doctrine

19  a necessary component of First Amendment jurisprudence "because persons

20  whose expression is constitutionally protected may well refrain from exercising

21  their rights for fear of criminal sanctions . . . .").[2]

22

23  ───────────────

     [2]    The Court would note that, to the extent that the speech proscribed by the Ordinance is purely "commercial" speech, application of the overbreadth doctrine may be

24  unwarranted. *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 71 L. Ed. 2d 362, 102 S. Ct. 1186 (1982); *but c.f. Am. Acad. of Pain Mgmt. v. Joseph*, 353 F.3d

25  1099, 1111-1112 (9th Cir. 2004) ("[A]n overbreadth challenge to a statute or regulation that reaches beyond purely commercial speech to encompass fully protected speech is appropriate.")

26  (citing *Village of Hoffman Estates*, 455 U.S. at 497). However, neither party has raised this issue at any time during the course of this litigation.

27

1    Accordingly, the Court affirms its prior findings that Plaintiffs have

2    standing to bring this lawsuit.

3    **II.    Constitutionality of the Ordinance**

4    Streets, highways and public sidewalks are "traditional public fora," in

5    which "First Amendment protections are subject to heightened scrutiny." *Board of*

6    *Airport Comm'rs v. Jews for Jesus, Inc.,* 482 U.S. 569, 573, 107 S. Ct. 2568, 96 L.

7    Ed. 2d 500 (1987); *see also Schneck v. Pro-Choice Network*, 519 U.S. 357, 377

8    (1997) (public speech "is at its most protected on public sidewalks, a prototypical

9    example of a traditional public forum"). However, "even in a public forum the

10   government may impose reasonable restrictions on the time, place, or manner of

11   protected speech, provided the restrictions are justified without reference to the

12   content of the regulated speech, that they are narrowly tailored to serve a

13   significant governmental interest, and that they leave open ample alternative

14   channels for communication of the information." *Ward v. Rock Against Racism*,

15   491 U.S. 781, 791, 109 S. Ct. 274, 105 L. Ed. 2d 661 (1989) (quoting *Clark v.*

16   *Community for Creative Non-Violence*, 468 U.S. 288, 293, 104 S. Ct. 3065, 82 L.

17   Ed. 2d 221 (1984).[3]

18   In the instant case, the parties dispute whether the Ordinance meets each of

19   the three elements of this test, namely whether it is (1) content-neutral; (2)

20   narrowly tailored to serve the City's proffered interests in traffic safety, crime

21   prevention and esthetics; and (3) leaves open adequate alternative channels for day

22   laborers and others to solicit the employment, business and contributions they

23   _____

[3]     This test is generally recognized as involving "intermediate" scrutiny. If a
24   regulation is content-discriminatory, it is subject to "strict" scrutiny, such that it will be upheld
     only if it is (1) narrowly tailored to promote a compelling government interest; and (2) the least
25   restrictive means available. *See, e.g, United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803,
     813 (2000) ("If a statute regulates speech based on its content, it must be narrowly tailored to
26   promote a compelling Government interest. If a less restrictive alternative would serve the
     Government's purpose, the legislature must use that alternative.") (internal citations omitted).
27

1    desire.

2    **A.    Whether the Ordinance is Content-Neutral**

3    **1.  General Test**

4    "The principal inquiry in determining content neutrality, in speech cases

5    generally and in time, place, or manner cases in particular, is whether the

6    government has adopted a regulation of speech because of disagreement with the

7    message it conveys." *Ward,* 491 U.S. at 791 (internal citations omitted); *see also*

8    *Glendale Assocs., Ltd. v. NLRB,* 347 F.3d 1145, 1155 (9th Cir. 2003) ("California

9    courts and the United States Supreme Court . . . hold that speech-regulating rules

10   are content-neutral when the rule is not related to the subject or topic of the

11   speech.") (internal citations omitted).   However, as the Supreme Court has

12   repeatedly recognized, "[d]eciding whether a particular regulation is content based

13   or content neutral is not always a simple task . . . ." *Bartnicki v. Vopper,* 532 U.S.

14   514, 526, 121 S. Ct. 1753, 149 L. Ed. 2d 787 (2001) (quoting *Turner*

15   *Broadcasting System, Inc. v. FCC,* 512 U.S. 622, 642-643, 129 L. Ed. 2d 497, 114

16   S. Ct. 2445 (1994)).  This case appears to be no exception.

17   Plaintiffs argue that the Ordinance is content-discriminatory on its face

18   because it bans only "solicitation" speech, such that law enforcement officials can

19   only determine if a particular individual's speech is violative of its provisions by

20   "looking to the *content* of the speaker's message." *See, e.g., Glendale Assocs.,*

21   347 F. 3d at 1155 ("A rule is defined as a content-based restriction on speech

22   when the regulating party must examine the speech to determine if it is

23   acceptable.");  *see also S.O.C., Inc. v. County of Clark,* 152 F.3d 1136, 1145 (9th

24   Cir. 1998).[4]   The City counters by arguing that the Ordinance is virtually identical

25

---

26   [4]      Plaintiffs are correct in that solicitation speech cannot be distinguished from other
speech by traditionally content-neutral criteria such as volume, appearance of the speaker, or

27   accompanying non-verbal conduct such as gestures.

1  to that at issue in the Ninth Circuit's opinion in *ACORN v. City of Phoenix,* 798

2  F.2d 1260 (9th Cir. 1986), which the Court explicitly held to be content-neutral.

3          The Phoenix ordinance at issue in *ACORN* provided as follows: "No person

4  shall stand on a street or highway and solicit, or attempt to solicit, employment,

5  business or contributions from the occupants of any vehicle." *ACORN*, 798 F.2d

6  at 1262.  In considering its content-neutrality, the Court noted:

> On its face, the Phoenix ordinance does not single out any group
> or the content of any speech.  The ordinance applies even-
> handedly to every organization or individual, regardless of
> viewpoint, which would desire to solicit contributions, business
> or employment from the occupants of vehicles traveling on
> Phoenix streets.  Any argument that this ordinance was passed to
> suppress the particular political views expressed by ACORN is
> contradicted by the parties' own stipulation in the pretrial order
> that the ordinance was adopted to promote the city's interest in
> "public peace, health and safety."  The ordinance is thus "content
> neutral."

15  *Id.* at 1267.

16          Plaintiffs insist that the *ACORN* Court improperly conflated the concept of

17  content-neutrality with the narrower concept of "viewpoint" neutrality and/or that

18  its analysis has been superceded by subsequent Supreme Court and Ninth Circuit

19  decisions.  In particular, Plaintiffs reference the Supreme Court's subsequent

20  decision in *City of Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 113 S.

21  Ct. 1505, 123 L. Ed. 2d 99 (1993), in which the Court struck down a municipal

22  regulation prohibiting the distribution of commercial publications through

23  sidewalk newsracks, but permitting the distribution of newspapers via the same

24  means.   The Court determined that, because it effected a ban only on

25  "commercial" publications, the regulation was content-based. 507 U.S. at 429

26  ("Under the city's newsrack policy, whether any particular newsrack falls within

27

- 10 -

1   the ban is determined by the content of the publication resting inside that

2   newsrack. Thus, by any commonsense understanding of the term, the ban in this

3   case is "content-based.").

4          Plaintiffs suggest that there is no difference between the Ordinance in this

5   case and the regulation at issue in *Discovery Network*, as the Ordinance inflicts a

6   similar ban on all speech within a clearly delineated subcategory–i.e.,

7   "solicitation" speech. However, the Court concludes that Plaintiffs' reading of

8   *Discovery Network* is overly simplistic. In addition to noting that the regulation

9   drew an obvious distinction between commercial and non-commercial

10  publications, the Court explained that the *justification* for this distinction could

11  not possibly be content-neutral. The Court noted that the only interests the city

12  advanced in support of the ban were interests in safety and esthetics. *Id.*   The

13  Court explained that these interests could not possibly be advanced by a ban on

14  solely "commercial" publications:

15             The city has asserted an interest in esthetics, but respondent
16             publishers' newsracks are no greater an eyesore than the
               newsracks permitted to remain on the Cincinnati's sidewalks.
17             Each newsrack, whether containing "newspapers" or "commercial
18             handbills," is equally unattractive.   While there was some
               testimony in the District Court that commerical publications are
19             distinct from noncommerical publications in their capacity to
20             proliferate, the evidence of such was exceedingly weak, the Court
               of Appeals discounted it, and Cincinnati does not reassert that
21             particular argument in this Court. As we have explained, the
22             city's primary concern, as argued to us, is with the aggregate
               number of newsracks on its streets. On that score, however, all
23             newsracks, regardless of whether they contain commercial or
24             noncommerical publications are equally at fault.   In fact, the
               newspapers are arguably the greater culprit.
25

26  *Id.* at 425-46.  Because the ban on commerical versus non-commercial

27  publications could not be "*justified* without reference to the content of the

- 11 -

1   regulated speech," *Ward*, 491 U.S. at 791 (internal citations omitted), it was

2   clearly a content-based regulation.[5]

3          Bans on in-person solicitation speech, in contrast, are  more readily justified

4   without reference to their essential content—i.e., the invitation for an exchange of

5   money or promises.  As the Court in *ACORN* recognized, there is "a distinction

6   between the purely communicative aspect of oral advocacy on the one hand, and

7   the solicitation of contributions on the other hand, which can prove more

8   disruptive of order and crowd flow." *ACORN*, 798 F.3d at 1268; *see also Doucette*

9   *v. City of Santa Monica*, 955 F.Supp. 1192, 1204 (C.D. Cal. 1997) ("A restriction

10  on solicitation may be content-neutral even if it regulates solicitation while

11  leaving other speech untouched, because the regulation focuses on the inherently

12  disruptive nature of the solicitation itself, and not on the content of the speech.").

13  Indeed, as the City points out, several other circuits as well as the California

14  Supreme Court have all reached the conclusion that bans on solicitation speech

15  similar to the ban at issue in *ACORN* are content-neutral.  *See, e.g.,  ACORN v. St.*

16  *Louis County*, 930 F.2d 591, 594 (8th Cir. 1991); *International Society for*

17  *Krishna Concisousness of New Orleans (ISKCON) v. City of Baton Rouge*, 876

18  F.2d 494 (5th Cir. 1989); *Los Angeles Alliance for Survival v. City of Los Angeles*,

19  22 Cal. 4th 352 (2000); *cf., Iskcon of Potomac, Inc. v. Kennedy*, 61 F.3d 949, 954

20  (D.C. Cir. 1995).   Finally, the Supreme Court, via its decision in *United States v.*

21  *Kokinda*, 497 U.S. 720, 110 S. Ct. 3115, 111 L. Ed. 2d 571 (1990), has suggested,

---

22          [5]      Other Supreme Court and Ninth Circuit cases that post-date *Discovery Network*
    have also emphasized the language in *Ward* that refers to a regulation's justification or purpose.
23  *See, e.g., Bartnicki*, 532 U.S. at  526 ("In determining whether a regulation is content based or
24  content neutral, we look to the purpose behind the regulation; typically, 'government regulation
    of expressive activity is content neutral so long as it is *justified* without reference to the content
25  of the regulated speech.'") (quoting *Ward*, 491 U.S.  at 791) (emphasis in original); *see also G.K.*
    *Ltd. Travel v. City of Lake Oswego*, 436 F.3d 1064 (9th Cir. 2006) ("Our primary concern is
26  determining whether a regulation of speech was adopted out of disagreement with a message
    sought to be conveyed. The government's purpose is the controlling consideration.").
27

1    albeit in dicta, that bans on solicitation speech are necessarily content-neutral. 497

2    U.S. at 730 ("It is the inherent nature of solicitation itself, a content-neutral

3    ground, that the [Postal] Service justifiably relies upon when it concludes that

4    solicitation is disruptive of its business. . . . Clearly, the regulation does not

5    discriminate on the basis of content or viewpoint.").

6         Accordingly, while recognizing the various conflicts that have arisen in this

7    area of First Amendment jurisprudence in recent years, the Court finds that it is

8    obligated to follow *ACORN* and other "solicitation" cases and conclude that the

9    Ordinance at issue here is in fact content-neutral.

10        **2.  Secondary Effects Doctrine**

11        Even assuming arguendo that Ordinance is content-based on its face, it may

12   nonetheless be analyzed as a content-neutral regulation under the "secondary

13   effects" doctrine. *See, e.g., Crawford v. Lungren,* 96 F.3d 380, 385 (9th Cir. 1996)

14   ("Some regulations which are seemingly content-based are analyzed as content-

15   neutral regulations if the government shows that they are justified by a desire to

16   eliminate a 'secondary effect' – an undesirable effect only indirectly related to the

17   content or communicative impact of the speech.") (citing *City of Renton v.*

18   *Playtime Theaters, Inc.,* 475 U.S. 41, 47- 49, 106 S. Ct. 925, 89 L. Ed. 2d 29

19   (1986)). *See also Tollis, Inc. v. San Bernardino County,* 827 F.2d 1329, 1332 (9th

20   Cir. 1988) ("If . . . the predominant purpose of the ordinance is the amelioration of

21   secondary effects in the surrounding community, the ordinance is content-

22   neutral") (internal citations omitted); *Colacurcio v. City of Kent,* 163 F.3d 545,

23   551-53 (9th Cir. 1998 ), *cert. denied,* 529 U.S. 1053, 146 L .Ed. 2d 459, 120 S. Ct.

24   1553 (2000) (finding that an ordinance which required nude dancers to perform at

25   least ten feet away from patrons was content-neutral because it targeted

26   "secondary effects" of "prostitution, drug dealing, and other criminal activity").

27

- 13 -

1    In *Colacurcio,* the Ninth Circuit examined various "objective indicators of
2    intent" to determine whether the purpose of the ordinance at issue was to suppress
3    speech or ameliorate secondary effects.  These indicators included the face of the
4    statute, the effect of the statute, comparison to prior law, facts surrounding
5    enactment, the stated purpose, and the record of proceedings.  *Id.* at 552.
6    Applying these factors to the present case, the Court concludes that the Ordinance
7    is justified by a desire to eliminate "secondary effects" which are only indirectly
8    related to the content or communicative impact of the proscribed speech.

9    The City states that the Ordinance was enacted in response to "citizen
10   complaints arising from events at [the intersections of Artesia Boulevard and
11   Felton Lane and Manhattan Beach Boulevard and Inglewood Avenue] includ[ing]
12   interruption of and congestion of traffic on these traffic arteries—primarily during
13   the morning rush hour—vandalism, litter, urinating in public, and occasional
14   fights."   The face of the Ordinance does not indicate that its purpose is to
15   suppress speech, rather than to curtail these problems.

16   At the same time, the City presents evidence regarding the history of the
17   enactment of the Ordinance, to which Plaintiffs do not object, that supports the
18   existence of a non-speech related purpose.  First, a memo dated March 17, 1987
19   from the City Attorney to the Mayor and City Council, proposing the Ordinance's
20   initial enactment, states that the City has had "extreme difficulties with persons
21   soliciting employment from the sidewalks along the Artesia corridor over the last
22   several years" and that "[t]here can be little question that traffic and safety hazards
23   occur by this practice."  Exhibit R.[6]   The City also submits a letter from the
24   Redondo Beach Business Association to the Mayor (albeit dated February 18,

25

---

26         [6]    The memo also compares the proposed ordinance to other laws, stating that the
proposed ordinance is "identical to one recently approved by the 9th circuit court of appeals [in
27   *ACORN*]" except for the additional sentence defining "street" to include "sidewalks."

- 14 -

1    1988, *after* the Ordinance was enacted).  The letter notes that the "problem" of

2    "the gathering of day laborers lining Artesia Blvd. hoping to obtain work"

3    resurfaces without constant re-enforcement of the Ordinance.  Exhibit S.  The

4    City submits a second memorandum, dated January 3, 1989, proposing the

5    amendment to the Ordinance to add subsection (b).  That memorandum states that

6    the Ordinance "was designed to alleviate sidewalk congestion and traffic hazards

7    which occurred when large numbers of persons congregated on the sidewalks

8    during the rush hours to obtain temporary employment."  Exhibit T.

9          The City also offers "testimonial" evidence concerning the statute's

10   purportedly non-speech related purpose, in the form of a declaration  from Officer

11   Rody A. Contreras, who has been employed as a police officer in Redondo Beach

12   since 1986.  Officer Contreras declares that the City has, for the past 15 years,

13   experienced "numerous traffic problems with day laborers who solicit employment

14   at the intersection of Artesia Boulevard and Felton Lane, and at the intersection of

15   Manhattan Beach Boulevard and Inglewood Avenue."  Officer Contreras also

16   asserts that citizen complaints have grown along with the size of the groups and

17   that these complaints pertain to interruption of traffic flow as well as acts of

18   vandalism, litter, and urination near businesses.[7]

19          Finally, with regard to the effect of the statute, Plaintiffs have submitted

20   evidence that it primarily affects day laborers.   The City does not disagree, to the

21   extent that it recognizes that its October 2004 enforcement efforts were known as

22

23          [7]      Plaintiffs object to this portion of Mr. Contreras' declaration on the grounds that it
     consists of unsubstantiated factual conclusions and constitutes inadmissible hearsay, to the extent
24   that it recounts "unsubstantiated constituent complaints."  However, in his capacity as an active
     police officer, Mr. Contreras would have personal knowledge of the presence of day laborers at
25   the specific intersections and any concomitant traffic problems. With respect to his statements
     concerning the citizen complaints, the Court finds they are not hearsay because they are not being
26   offered for the truth of the matters asserted therein, but rather for their effect on city officials and
     their decision to enact the Ordinance. *See* Section III.B., *infra.*
27

1   "The Day Labor Enforcement Project" and that "mass" arrests of day laborers

2   occurred on particular dates.  Def. Opp. to Statement of Uncontroverted Facts at 5,

3   8.  The existence of these facts does not, however, indicate that the Ordinance is

4   aimed at the content or communicative impact of speech.

5   Plaintiffs assert that even if the City has provided sufficient evidence that

6   the Ordinance was designed to ameliorate specific "secondary effects," it cannot

7   resort to the doctrine in this case because the doctrine's application has not been

8   expanded beyond the context of regulation of the adult industry (i.e., theaters,

9   bookstores, etc.) and/or other forms "less protected" speech.   Plaintiffs assertion

10  is not correct.  Although the doctrine originated in the Supreme Court's seminal

11  decision in *City of Renton v. Playtime Theatres, Inc., supra*, only two years later,

12  in *Boos v. Barry*, 485 U.S. 312, 108 S. Ct. 1157, 99 L. Ed. 2d 333 (1988), a

13  plurality of the justices framed the holding in *Renton* in broad terms: "So long as

14  the justifications for regulation have nothing to do with content . . . a regulation

15  [is] properly analyzed as content-neutral." 485 U.S. at 320.

16  Contrary to Plaintiffs' assertions, the Ninth Circuit's recent decision in

17  *Gammoh v. City of La Habra*, 395 F.3d 1114 (9th Cir. 2005) does not purport to

18  clarify *Boos* in any way or otherwise hold that the secondary effects doctrine is

19  limited to "sexual or pornographic speech."  Rather, *Gammoh* is another example

20  of the Court applying the "secondary effects" doctrine to the facts of the case

21  before it.  Indeed, the fact that the Court has affirmatively stated the secondary

22  effects doctrine applies to pornographic speech does not mean it does not apply to

23  speech in other categories.

24  Accordingly, the Court finds that the Ordinance is content-neutral and turns

25  its attention to the question of whether it is an otherwise valid "time, place and

26  manner" restriction.

27

- 16 -

1

**B.    Whether the Ordinance is Narrowly Tailored to Serve a**
2      **Significant Government Interest**

3      **1. Significance of The City's Asserted Interests**

4             The City contends that the Ordinance was enacted to protect and promote

5      the following interests:  (1) traffic flow and safety; (2) crime prevention; (3)

6      esthetics. If it finds that any one of these interests is "significant," the Court must

7      address the question of whether the Ordinance is in fact "narrowly tailored" to

8      further that interest. *See, e.g., Edwards v. City of Santa Barbara*, 150 F.3d 1213,

9      1216 (9th Cir. 1998) ("A single legitimate government interest may be sufficient

10     to sustain a content-neutral regulation.") (citing *Heffron v. Int'l Soc'y for Krishna*

11     *Consciousness, Inc.*, 452 U.S. 640, 650 n.13, 69 L. Ed. 2d 298, 101 S. Ct. 2559

12     (1981)).  For the reasons discussed below, the Court so finds.

13            First, it is virtually axiomatic that the City has a "significant" interest in

14     traffic flow and safety. *Accord Heffron*, 452 U.S. at 650 ("As a general matter, it

15     is clear that a State's interest in protecting the 'safety and convenience' of persons

16     using a public forum is a valid governmental objective"); *see also ACORN*, 798

17     F.2d at 1268 (recognizing "the substantial risk of disruption in crowd or traffic

18     control that may be presented by solicitation of contributions, as compared to

19     other forms of expression.").   The City's interest in crime prevention is similarly,

20     intrinsically significant. *See Martin v. Struthers*, 319 U.S. 141, 144, 63 S. Ct. 862,

21     87 L. Ed. 1313 (1943).  Finally, numerous courts have recognized that cities and

22     municipalities have a significant interest in maintaining the esthetic appearance of

23     their public fora (often in tandem with an interest in traffic safety). *Accord*

24     *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 507-508, 101 S. Ct. 2882, 69

25     L. Ed. 2d 800 (1981) ("Nor can there be substantial doubt that the twin goals that

26     the ordinance seeks to further—traffic safety and the appearance of the city—are

27     substantial governmental goals"); *G.K. Ltd. Travel v. City of Lake Oswego*, 436

1    F.3d 1064 (9th Cir. 2006) ("Against the backdrop of numerous decisions of the

2    Supreme Court and this court, we do not doubt that Lake Oswego's interests in its

3    appearance and the safety of the public are significant and well established.").

4                            **2.  Tailoring**

5          In order to be narrowly tailored, a restriction on speech may not "burden

6    substantially more speech than is necessary to further the government's legitimate

7    interests." *Ward*, 491 U.S. at 799.  While the restriction need not be "the least

8    restrictive or least intrusive means" of furthering the government's interest, the

9    government "may not regulate expression in such a manner that a substantial

10   portion of the burden on speech does not serve to advance its goals." *Id.*; *see also*

11   *Galvin v. Hay,* 374 F.3d 739, 753 (9th Cir. 2004) ("[A]lthough the regulation need

12   not be minimally restrictive, the availability of several obvious less-restrictive

13   alternatives is pertinent in deciding whether the regulation burdens substantially

14   more speech than necessary to achieve its purposes.").  With these principles in

15   mind, the City's asserted interests are analyzed in turn.

16                    **a.  Traffic and Pedestrian Safety**

17         The City maintains that the Court must find that the Ordinance is narrowly

18   tailored to promote "traffic flow and safety" because it "was based specifically on

19   the Phoenix ordinance" at issue in *ACORN, supra.* Mot. at 17.  However, *ACORN*

20   involved an essentially "as-applied" challenge to the Phoenix ordinance on behalf

21   of a political activist organization ("ACORN") that engaged in highly specific

22   tactics to attract the attention of passing motorists.  These tactics, known as

23   "tagging," involved an activist "stepping into the street and approaching an

24   automobile when it is stopped at a red traffic light." *ACORN,* 798 F.2d at 1262.

25   That same individual would then proceed to "ask[] the occupants of the vehicle for

26   a contribution to ACORN and distribute[] a slip of paper, or 'tag,' providing

27                                    - 18 -

1   information about ACORN and its activities." *Id.* Also, the *ACORN* Court

2   specifically noted that the Phoenix ordinance did not clearly target individuals

3   soliciting from a sidewalk and/or from locations not "in direct proximity to the

4   street." *Id.* at 1269, n.9.

5          Thus, by its very terms, the Ordinance at issue here sweeps in a much larger

6   amount of "solicitation" speech and speech-related conduct than the ordinance at

7   issue in *ACORN*. First, the Ordinance unequivocally applies to individuals who

8   stand on the *sidewalk.* These individuals may or may not attempt to stop the flow

9   of traffic; although a given day laborer may signal a given vehicle and its

10  occupants to "stop" and confer, he or she may just as readily signal for that

11  individual to pull into an adjacent parking lot.   Indeed, the various photographs

12  submitted by the City show that the sidewalks that run along the relevant streets

13  and intersections go back several feet, such that the Ordinance would reach an

14  individual standing well away from the flow of traffic and who merely holds up a

15  sign inviting the occupants of vehicles to drive to a private location to confer.

16  Exhibits A-Q.  Such activity is a far cry from the "tagging" tactics employed by

17  the political activists in *ACORN*.  *Compare ACORN*, 798 F.2d at 1272 ("[T]he

18  district court concluded there was no evidence to suggest that the Phoenix

19  ordinance curtailed any activity other than solicitation from vehicles at an

20  intersection.  We agree."), *with Coalition for Humane Immigrant Rights of Los

21  Angeles (CHIRLA) v. Burke*, 2000 U.S. Dist. LEXIS 16520 *18 (C.D. Cal. 2000)

22  (striking down city ordinance banning solicitation of motor vehicles by day

23  laborers where the ordinance reached "even a solicitor who stands on the

24  sidewalk, away from the curb, and unobtrusively attempts to make known to the

25  occupants of the vehicle his availability for work.").  Second, because the

26  Ordinance does not define the terms "solicit," or "business," it may plausibly

27

- 19 -

1   apply to an individual attempting to hail a cab or a bus or any of a number of other
2   activities that do not interrupt the general flow of traffic and that were left entirely
3   unanalyzed by the *ACORN* decision.[8]  Moreover, as this Court has already noted,
4   "the risk of drivers being 'distracted' appears to be significantly less where the
5   drivers are actively seeking the services of day laborers instead of being suddenly
6   and unwillingly approached by strangers."  Findings of Fact and Conclusions of
7   Law, December 15, 2005, at 9.

8          The ordinance is similarly overbroad with respect to the prohibition on
9   motorists. The City makes much of the fact that "there is no place along Artesia
10  Boulevard or Manhattan Beach Boulevard, where the day laborers congregate,
11  where parking is legal."   However, as it is written, the Ordinance in fact applies to
12  solicitation of employment from occupants of *lawfully* parked vehicles or vehicles
13  stopped on residential streets on which there may or may not be significant traffic.
14  Indeed, by its plain terms, the Ordinance would apply to a motorist who stops, on
15  a residential street, to inquire whether a neighbor's teen-age daughter or son would
16  be interested in performing yard work or babysitting.   The City's response to such
17  an argument is that the Ordinance has never been and would not be enforced in
18  such a situation, viz., where no actually safety issues are presented. *See* Defs.
19  Mot. at 19; Reply at 9-10.   However, the fact that the City admits that it will
20  enforce the Ordinance only when the activity at issue actually implicates traffic
21  safety (and/or only when day laborers are involved) confirms that the Ordinance is
22  overbroad, and raises serious equal protection concerns. *See, e.g.,* Kenneth Karst,
23  *Equality as a Central Principle in the First Amendment,* 43 Chi.L.Rev. 20, 38
24  (1975-76) ("One of the evils of an overly broad statute is its potential for selective

25  _____
26  [8]        In fact, the Ordinance would technically apply to children selling lemonade on the
    sidewalk in front of their home, as well as to Girl Scouts selling cookies on the sidewalk outside
27  of their school.

                                        - 20 -

1   enforcement.  Police who look charitably on a postgame victory celebration in the
2   streets of a college town may not feel the same way about anti-war
3   demonstrations.").  Also, as Plaintiffs point out, predicating an individual's
4   criminal liability under the Ordinance on whether the solicited driver actually
5   "stops" his or her vehicle would allow "residents who are hostile to day labors" to
6   "catalzye an arrest or citation" simply by so stopping.  This would improperly
7   "confer broad powers of censorship, in the form of a 'heckler's veto,'" on these
8   individual residents.  *Reno v. ACLU*, 521 U.S. 844, 880, 117 S. Ct. 2329, 138 L.
9   Ed. 2d 874 (1997).

10          Finally, there are a myriad of less restrictive means by which the City may
11   address the underlying interest of traffic safety.  These means include enforcement
12   of existing traffic laws, issuance of parking citations, and enforcement of loitering
13   laws. *See, e.g.,* Redondo Beach Municipal Code § 3-7.12 ("Appropriate signs or
14   marks indicating that the stopping, standing or parking of vehicles is there
15   unlawful shall be installed at places and points specified in this article whenever
16   the City Manager shall have determined, with references to any particular location,
17   that vehicles not in motion would tend to create traffic congestion or to increase
18   traffic hazard."); *see also* Cal. Penal Code § 647(e) (loitering prohibited); Cal.
19   Vehicle Code §§ 22500, 22651 (obstruction of traffic).

20          Accordingly, the Court finds that the City has failed to meet its burden of
21   demonstrating that the Ordinance is narrowly tailored to promote the interests of
22   traffic flow and safety.

23                    **b.    Crime Prevention and Esthetics**
24          There is also minimal convergence between the Ordinance's prohibition on
25   solicitation speech and the City's alleged interest in preventing petty crimes, such
26   as vandalism and "fighting," and in maintaining urban esthetics through the
27                                    - 21 -

1  prevention of public urination and littering.  The fact that the City has received

2  some citizen complaints regarding day laborers' involvement in these activities is

3  insufficient to justify preventing all laborers or other solicitors from engaging in

4  speech.  *See, e.g., CHIRLA*, 2000 U.S. Dist. LEXIS 16520 at *30  ("While it may

5  be true that every individual solicitor is a potential harasser, trespasser, and public

6  urinator, courts are rightly reluctant to allow the government to target a category

7  of speech based on the risk that some speakers may engage in harmful activity.")

8  (citing *Krantz v. City of Fort Smith*, 160 F.3d 1214, 1219-22 (8th Cir. 1998)).  In

9  addition, *all* of these harms can be readily addressed through enforcement of

10 existing statutes.  *See id.* (citing Cal. Penal Code § 374.4 (littering); § 415

11 (fighting, noise, and offensive words); § 602(n) (trespassing); § 647 (disorderly

12 conduct); § 647c (willful and malicious obstruction of right-of-way)); *see also*

13 Redondo Beach Municipal Code § 4-9.201 (littering unlawful).

14        Accordingly, the Court finds that the City has failed to meet its burden of

15 demonstrating that the Ordinance is narrowly tailored to promote the interests of

16 crime prevention and esthetics.

17              **3.    Alternative Avenues for Communication**

18        It is the City's burden to prove that the Ordinance leaves day laborers (and

19 others) with adequate alternative avenues of communication.  *Lim v. City of Long*

20 *Beach*, 217 F.3d 1050, 1054 (9th Cir. 2000).  The City may meet this burden

21 through the introduction of evidence showing that the day laborers may

22 communicate their message and obtain the same advantages therefrom (i.e.,

23 employment) through other means than standing on the sidewalk and soliciting

24 motor vehicles.  *See, e.g., Members of City Council v. Taxpayers for Vincent,* 466

25 U.S. 789, 812, 104 S. Ct. 2118, 80 L. Ed. 2d 772 (1984).  The City argues that

26 such a showing may be readily made because the Ordinance, as plainly written,

27

1  leaves day laborers with the option of congregating in the parking lots of adjacent

2  businesses and soliciting drivers from *that* vantage point.  Nevertheless, it has

3  presented no evidence that any of the local businesses whose parking lots abut the

4  public sidewalks would allow this practice.

5        Indeed, as the Court has already recognized, parking lots of private

6  businesses are not necessarily treated as public fora.  As it did in its Opposition to

7  the Court's Order to Show Cause Re: Preliminary Injunction, the City relies on

8  *Prunyard Shopping Center* v. *Robins,* 447 U.S. 74, 64 L.Ed. 2d 741, 100 S.Ct.

9  2035 (1980) and *Glendale Assocs., supra,* as well as *Kuba v. 1-A Agric. Ass'n*, 387

10  F.3d 850 (9th Cir. 2004) and *Carreras v. City of Anaheim,* 768 F.2d 1039, 1042

11  (9th Cir. 1985).  Each of those cases involved major private shopping centers or

12  stadiums which attracted thousands of patrons per day and/or encompassed

13  numerous businesses; the Courts held that these features rendered the location the

14  functional equivalent of a traditional public forum.  However, California courts

15  have eschewed the application *Prunyard* to smaller spaces, such as the parking

16  lots of large grocery stores.  *See, e.g., Albertson's Inc. v. Young,* 107 Cal. App. 4th

17  106, 121 (Cal. Ct. App. 2003) ("[T]he smaller the business, the more weight the

18  owners' rights will have."); *Trader Joe's Co. v. Progressive Campaigns, Inc.,* 73

19  Cal. App. 4th 425, 433 (Cal. Ct. App. 1999). In the instant case, the photographs

20  submitted by the City reveal that the businesses that abut the sidewalks on Artesia

21  Boulevard and Manhattan Beach Boulevard consist of even smaller, individual

22  proprietor-type operations, such as a doughnut shop, gas stations, restaurants and a

23  "7-Eleven."  Exhibits A-Q.  Thus, their parking lots would be unlikely to be

24  regarded by state or federal courts as the equivalent of public fora for First

25  Amendment purposes.

26        Moreover, as this Court previously noted:

27

> The Supreme Court based its holding in *Pruneyard* on the fact that the shopping center "may restrict expressive activity by adopting time place and manner regulations that will minimize interference with its commercial function" . . . . Since shopping centers may restrict expressive activities on their property, their parking lots do not constitute an adequate alternative forum for the solicitation of employment, business or contributions.  While the shopping centers in Redondo Beach may not have such time, place and manner regulations at the present time, they may very well implement them if day laborers moved there.[9]  Day laborers who did not abide by such restrictions would risk being charged with trespass.

Findings of Fact and Conclusions of Law, December 15, 2004, at 12 (quoting *Pruneyard*, 477 U.S. at 83). *Accord CHIRLA*, 2000 U.S. Dist. LEXIS 16520 at *41 ("Trespass is not an 'ample alternative avenue' to speaking in a public forum.").  Thus, the Court finds that the City has failed to present evidence that the adjacent parking lots are adequate alternative avenues of communication for Plaintiffs' members.

Nor do there exist other adequate means by which the day laborers may solicit employment.  While solicitation of pedestrians is not expressly precluded under the Ordinance, there is no evidence that such solicitation would be as effective as motor vehicle solicitation and, in fact, it is counterintuitive to assume so, as most individuals who set out seeking to hire day laborers do so in their cars. In addition, it is unlikely that any laborers would attempt such solicitation; rather, they would likely be "chilled" from doing so for fear of being prosecuted under the Ordinance.  While it is true that the Ordinance only proscribes speech directed

---

[9]     Indeed, it is reasonable to infer that the businesses whose parking lots front the sidewalks *will* attempt to restrict solicitors, as these are the very same businesses that lodged the complaints about the day laborers' presence that prompted the City to pass the Ordinance in the first instance.

- 24 -

1   at motor vehicles, speech (signs, shouting) or speech-related conduct (gestures)

2   directed at pedestrians may be inadvertently construed by law enforcement officers

3   to be directed at passing cars as well. *See id.* at *22-23 ("Although the County

4   argues that the Ordinance permits speakers to solicit pedestrians and the occupants

5   of legally parked cars, it is difficult to see how a solicitor could direct his speech at

6   these listeners in the vicinity of a public street or driveway without experiencing a

7   reasonable and chilling fear that he would be prosecuted under the Ordinance.").

8          Finally, the mere existence of various "labor centers" or "hiring halls" in the

9   greater Los Angeles metropolitan area is insufficient to support a finding that there

10  exist "adequate alternative channels" for Plaintiffs' members' speech.[10]  While it is

11  true that Plaintiffs have not disclosed the names and addresses of their members

12  such that the Court might determine their relative proximity to a "labor center,"

13  the fact remains that none of the centers referenced by the City are located *within*

14  its borders.   Nor has the City endeavored to create such a center or designate other

15  public property as a place for facilitating exchanges between day laborers and

16  potential employers. *Compare Xiloj-Itzep v City of Agoura Hills*, 24 Cal. App. 4th

17  620, 645 (Cal. Ct. App. 1994) (city-sponsored "telephone hiring exchange"

18  constituted ample alternative channel for communication.).

19         Accordingly, the Court finds that the City has failed to establish the

20  existence of ample alternative avenues of communication and, concomitantly, has

21  failed to demonstrate that the Ordinance is a valid time, place and manner

22  restriction more generally.

23

24

25

---

26   [10]    The City has produced no actual evidence attesting to the existence of these
     centers; it simply refers to them by reference to a list contained on Plaintiff NDLON's website.

27

## III.   Evidentiary Objections

### A.   The City's Objection to the Declaration of Pablo Alvarado

The City has objected to paragraph 6 of the Declaration of Pablo Alvarado, which Plaintiffs submitted with their Opposition to the City's motion. Alvarado is the National Coordinator of Plaintiff NDLON, and paragraph 6 of his declaration concerns resources NDLON has had to expend in response to the ordinance at issue in this case.  The amount of resources expended goes only to the issue of NDLON's standing, which the Court has ruled on twice already.  For this reason, the Court has no need to consider Mr. Alvarado's declaration in the first instance and, accordingly, does not need to rule on the City's objection thereto.

### B.   Plaintiffs' Objections to the Declaration of Rody A. Contreras

Plaintiffs have objected to portions of the Declaration of Rody A. Contreras, a police officer with the Redondo Beach Police Department.  Contreras describes the City's 15-year history of traffic problems associated with day laborers congregating at certain intersections to solicit work (¶ 2);  numerous complaints the police department has received from both business owners and local residents regarding the day laborers, including their purported contributions to traffic congestion, vandalism, littering, and public urination (¶ 3); and the purpose and results of the two-phase sting operation known as the Day Laborer Enforcement Project (¶¶ 4-13).  Contreras also authenticates a number of photographs of local day laborers and the areas in which they congregate.  (¶¶ 15-24).

The portions of the Contreras declaration which describe the extent of the City's problems with day laborers and the complaints are relevant to establish the motivation for the Ordinance's enactment.   To the extent that Contreras' statements regarding the citizens' complaints are offered and considered only for the limited purpose of showing the effect they had on the City Council—i.e., that

- 26 -

1  they motivated the council members to enact the Ordinance—they are admissible

2  non-hearsay. *See L.A. News Serv. v. CBS Broad., Inc.,* 305 F.3d 924, 936 (9th Cir.

3  2002) ("Out-of-court declarations introduced to show the effect on the listener are

4  not hearsay."). Moreover, as a patrol field sergeant who has been with the

5  Redondo Beach Police Department since 1986, Mr. Contreras has sufficient

6  personal knowledge of these facts. Accordingly, the Court OVERRULES

7  Plaintiffs' objections to these portions of his declaration.

8  　　　The Court SUSTAINS Plaintiffs' objections to those portions of the

9  Contreras declaration describing the number and nature of arrests made during the

10  two phases of the Day Laborer Enforcement Project (¶¶ 4-13), on relevance

11  grounds. Because this is a facial challenge to the Ordinance, evidence of the

12  manner in which it has been enforced is not needed.

13  　　　Plaintiffs do not object to the photographs submitted with the Contreras

14  declaration; instead, they have objected to certain comments made by Contreras in

15  the course of authenticating the photographs, namely that certain individuals

16  pictured therein are in fact "day laborers." The Court SUSTAINS these objections,

17  as the statements regarding the individuals' identities constitute improper lay

18  opinion. *See* Fed. R. Evid. 701. The balance of the Plaintiffs' objections are

19  OVERRULED.

20  　　**C.    Plaintiffs' Objections to the Declaration of W. Michael Webb**

21  　　　Plaintiffs also object to portions of the Declaration of W. Michael Webb, the

22  current City Attorney for the City of Redondo Beach. Webb describes the history

23  and precise nature of the complaints the City has received regarding congregating

24  day laborers since 1981 and mentions that the City tried, without success, to

25  address the complaints using existing laws. (¶¶ 3-4.) He then describes, based on

26  his review of the legislative history, the City's enactment of each section of the

27

1  ordinance.  (¶¶ 5-6.)  Finally, he authenticates and describes the contents of three
2  documents from the legislative history "file" of the Ordinance.  (¶¶ 7-9.)
3          While Plaintiffs do not object to the contents of legislative history
4  documents attached to the Webb declaration, they do make a demand that the City
5  produce the remainder of the legislative history "file."   As support for this demand,
6  they cite to Fed. R. Evid. 106, which states: "[w]hen a writing or recorded
7  statement or part thereof is introduced by a party, an adverse party may require the
8  introduction at that time of any other part or any other writing or recorded
9  statement which ought in fairness to be considered contemporaneously with it."
10  Fed. R. Evid. 106.  However, there is no indication in the papers that Plaintiffs
11  have ever sought discovery of the entire legislative history file through normal
12  discovery channels.  Nor do Plaintiffs explain why the remaining legislative history
13  documents "ought in fairness to be considered contemporaneously with" the three
14  documents attached to the Webb declaration. Accordingly, the Court DENIES
15  Plaintiffs' demand for production and introduction of the legislative history file.
16  However, the Court SUSTAINS the objections to Webb's summaries of the
17  contents of those documents which are attached (Exhibits R-T), although it
18  considers the documents themselves as admissible non-hearsay, to the extent that
19  the citizens' complaints recounted therein are offered (and considered by the Court)
20  only for the limited purpose of showing the motivation of the City Council in
21  enacting the Ordinance.
22          With respect to Webb's statements concerning citizen complaints about day
23  laborers' involvement in littering, vandalism, and public urination more generally,
24  and the City's efforts to curtail these problems prior to its enactment of the
25  Ordinance (¶¶ 3-6), Plaintiffs object that they lack foundation.   As Webb has
26  obtained his knowledge of the complaints only from his review of  Exhibits R-T,
27
- 28 -

1    his statements are in fact so lacking. *See* Fed. R. Evid. 602.  Accordingly, the Court

2    SUSTAINS the objection and does not consider these statements.

3                                    **CONCLUSION**

4          For all of the foregoing reasons, the Court GRANTS Plaintiffs' motion for

5    summary judgment and DENIES the City's motion.  Although it is content-neutral,

6    the Ordinance is not narrowly tailored to address the City's asserted interests, nor

7    does it leave open ample alternative channels for the speech it proscribes.

8          It is hereby ORDERED that:

9    (1)    The City of Redondo Beach, as well as its officers, agents, servants,

10          employees, and attorneys and those persons in active concert or

11          participation with them, are enjoined in perpetuity from enforcing

12          Redondo Beach Municipal Code § 3-7.1601.  The City shall be

13          responsible for providing notice of this Order to its officers, agents,

14          servants, employees, and attorneys and those persons in active concert

15          of participation with them; and

16

17   (2)    Any and all fines, penalties, or records of infractions of Redondo

18          Beach Municipal Code § 3-7.1601 shall be rescinded or removed and

19          restitution provided.

20

21   IT IS SO ORDERED.

22   Date: April 27, 2006

23                                    CONSUELO B. MARSHALL
                                      UNITED STATES DISTRICT JUDGE

24

25

26

27